**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**JANE DOE,** *et al.*,

                  Plaintiffs,

        v.

**MIKE POMPEO,** *et al.*,

                  Defendants.

Case No. 1:20-cv-00065 (TNM)

## <u>MEMORANDUM OPINION</u>

Jane Doe and her children are trying to escape her abusive husband in Iran. They became Green Card holders in 2013, but he has secreted their Cards since the family returned to Iran in 2015. They ask the Court to order the Government to provide them authorization to travel to a port of entry, where they could have an admissibility hearing. They acknowledge that the Government has procedures in place for obtaining this sort of authorization. They contend, however, that none of the available procedures would afford them due process. And they claim that, as permanent residents, they have a constitutional right to due process before the Government can deny them admission.

The Court finds, however, that Doe and her children do not have this constitutional right, given how long they have been outside the United States. Thus, while the Court is mindful of the hardships that Doe and her children face, it cannot grant the relief that they seek. The Court will enter judgment for the Government.

# I.

## A.

Before turning to the facts of this case, a brief review of the relevant statutory framework is in order. Under federal law and regulations, a Green Card confers certain limited privileges. Green Card holders are aliens who have been "lawfully admitted for permanent residence." 8 U.S.C. § 1101(a)(20). This means "the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, *such status not having changed*." *Id.* (emphasis added). So the very definition of "permanent" residence contemplates that this status is not necessarily permanent—it can change. One way it changes is if a Green Card holder stops living in the United States, *i.e.*, departs the country "for more than a 'temporary visit abroad.'" *United States v. Yakou*, 428 F.3d 241, 248–49 (D.C. Cir. 2005) (quoting 8 U.S.C. § 1101(a)(27)(A)).

And while Green Card holders can generally come and go from the country more readily than nonresident aliens, there are restrictions. As a default rule, when Green Card holders travel abroad and then return, they are "not . . . regarded as seeking an admission into the United States," so they can reenter without undergoing "inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A), (C). But there are several exceptions. For example, they must go through this process if they have "abandoned or relinquished" their permanent resident status. *Id.* § 1101(a)(13)(C)(i). So too if they were abroad "for a continuous period in excess of 180 days." *Id.* § 1101(a)(13)(C)(ii).

Green Card holders seeking admission typically must present one of several documents. 8 C.F.R. § 211.1(a). An unexpired Green Card counts, but *only* if the holder "is seeking readmission after a temporary absence of less than 1 year." *Id.* § 211.1(a)(2). Another option is

a "Form I-327, Permit to Reenter," *id.* § 211.1(a)(3), which is valid for up to two years, *see* 9

Foreign Affairs Manual ("FAM") § 202.2-4(D)(2)(a)(1).[1]  Applicants for these reentry permits

must be "physically present in the United States."  *Id.* § 202.2-4(D)(2)(a)(2).  So resident aliens

who know they will be abroad for longer than a year will typically apply for a reentry permit

before departing.  If they do not, or if they end up abroad for more than two years, they will

generally need "[a] valid, unexpired immigrant visa" to reenter the United States.  8 C.F.R.

§ 211.1(a)(1).  Green Card holders in this situation may be eligible for a special type of

immigrant visa called the SB-1 returning resident visa.[2]

Green Card holders can obtain this visa if, despite being abroad for more than a year, they

are still "returning from a temporary visit abroad."  8 U.S.C. § 1101(a)(27)(A); *see* 22 C.F.R.

§ 42.22(a); 9 FAM § 502.7-2.  If a visit abroad was temporary, the Green Card holder does not

lose her permanent resident status under 8 U.S.C. § 1101(a)(20) by her absence.  *See Yakou*, 428

F.3d at 248, 250.  So the SB-1 visa process tries to identify Green Card holders whose absence

from the United States has not changed their permanent resident status under § 1101(a)(20).

Regulations elaborate on who is eligible for an SB-1 visa.  A consular officer must be

"satisfied from the evidence presented" that the alien "departed from the United States with the

intention of returning and has not abandoned this intention."  22 C.F.R. § 42.22(a)(2).  More, the

---

[1]  The State Department's Foreign Affairs Manual is an "authoritative source for the
Department's organization structures, policies, and procedures."  U.S. Dep't of State, *Foreign
Affairs Manual & Handbook*, https://fam.state.gov/ (last visited Mar. 31, 2020).

[2]  This understanding aligns with the State Department's explanation: "If you are [a lawful
permanent resident] unable to return to the United States within the travel validity period of the
[G]reen [C]ard (1 year) or the validity of the Re-entry Permit (2 years), you may be eligible and
can apply at the nearest U.S. Embassy or Consulate for a Returning Resident (SB-1) immigrant
visa."  U.S. Dep't of State, *Returning Resident Visas*, https://travel.state.gov/content/travel/en/us-
visas/immigrate/returning-resident.html (last visited Mar. 31, 2020).

officer must be satisfied that "if the stay abroad was protracted, this was caused by reasons beyond the alien's control and for which the alien was not responsible." *Id.* § 42.22(a)(3).

Generally, to travel here in the first place, a Green Card holder must have a document that qualifies her for admission. It is "unlawful for any person, including any transportation company . . . to bring to the United States . . . any alien who does not have a valid passport and an unexpired visa, if a visa was required under this chapter or regulations issued thereunder." 8 U.S.C. § 1323(a)(1). So if a Green Card holder has been abroad for less than a year, she should be able to board a plane back to the United States with her Green Card. *See* 8 C.F.R. § 211.1(a)(2). If she has been away for longer, she will likely need a reentry permit or an SB-1 visa. *See id.* § 211.1(a)(1), (3).

There are some other travel documents that Green Card holders can use. For example, if an alien's Green Card is lost or stolen, she could potentially receive a "boarding foil" from a consular officer and use that to travel. *See* 9 FAM § 202.2-5. But when she arrives at a port of entry, she would likely need to seek a waiver for not having an entry document. *See* 8 C.F.R. § 211.1(b)(3).

Even if a Green Card holder seeking admission does have a Green Card, a reentry permit, or an SB-1 visa, that is just the beginning. None of these documents is a sure ticket into the United States. A Green Card holder might still be inadmissible—and so subject to removal proceedings—for any number of reasons. *See* 8 U.S.C. §§ 1182(a), 1229a(a). For example, the Government might seek to remove a returning alien if it believes she has abandoned her permanent resident status. *See, e.g.*, *Hana v. Gonzales*, 400 F.3d 472, 474–75 (6th Cir. 2005).

The petitioner in *Hana* was an Iraqi woman with a Green Card. *Id.* at 473. Soon after receiving her Green Card, she visited Iraq for two years. *Id.* at 474. She returned to the United

States, but then made another visit to Iraq, again returning two years later. *Id.* Both times she

returned to the United States, she had an unexpired reentry permit. *Id.* But the second time, the

Government "charged her with excludability under 8 U.S.C. § 1182(a)(7)(A)(i)(I) as an

immigrant without a valid visa." *Id.* at 474–75. It believed that her two trips to Iraq were not

"temporary visit[s] abroad" under § 1101(a)(27)(A), meaning that she had abandoned her

permanent resident status. *Id.* at 475.

In short, Green Card holders must navigate restrictions on travel and admission before

they can reenter the country. To be sure, none of the foregoing speaks to what is *constitutionally*

required. That is the issue here, since Doe brings a due process claim. Perhaps the Government

affords inadequate process to certain Green Card holders, including the Plaintiffs. Or perhaps

the Government gives some or all Green Card holders more process than is constitutionally

required. With that in mind, the Court turns to the particulars of Doe's claim.

**B.**

Richard Roe, Doe's husband, has abused her since they married in 2006. Mot. for

Prelim. Inj. Ex. B ¶¶ 6, 10, ECF No. 6-3.[3] He once broke her arm while she was pregnant. *Id.*

¶¶ 19, 22. He has also abused their two children. *Id.* ¶ 14. As a result, their daughter has

exhibited aggression at school, and their son has repeatedly spoken of committing suicide. *Id.*

¶¶ 16–18. Doe tried to get a divorce several years ago, but she withdrew the case after an Iranian

judge made clear that he would award Roe custody of their children. *Id.* ¶¶ 26, 28.

---

[3] The Complaint refers to Doe, her children, and her husband using pseudonyms. Compl. ¶ 1, ECF No. 1. Given the information provided by the Plaintiffs under seal, the Court follows that convention here. *See* Minute Order (Jan. 30, 2020).

The family first came to the United States from Iran in 2012, *id.* ¶ 29, and Doe and her children became lawful permanent residents the next year, *see* Mot. for Prelim. Inj. Ex. A at 1–3,[4] ECF No. 6-2.  But in a colloquial sense, they were never permanent residents here.  From 2012 to 2015, the family would come to the United States once a year for only a couple of weeks and then return to Iran.  Mot. for Prelim. Inj. Ex. B ¶¶ 29–31.  And they have not returned since.  Doe says that she "wanted very much to stay in the U.S.," but Roe "forced [her] to return to Iran."  *Id.* ¶ 32.  He had control over their Green Cards "at all times."  *Id.* ¶ 36.

After the family returned to Iran in 2015, Roe told Doe that their Green Cards had expired.  *Id.* ¶ 37.  She "had absolutely no reason to disbelieve him," so she gave up hope of returning to the United States.  *Id.* ¶ 38.  Recently, though, Doe found their Green Cards— unexpired—among Roe's possessions.  *Id.* ¶ 39.  So she purchased airline tickets.  *Id.* ¶ 42.  But when she went to retrieve the Green Cards, they were gone.  *Id.* ¶ 44.  Doe presumes that Roe took them and fears that he suspects her plan to escape.  *Id.* ¶ 45; Compl. ¶ 4, ECF No. 1.

Doe alleged all of this in a November 2019 declaration.  A little over a month later, she sued the Secretary of State, the Acting Secretary of Homeland Security, the Director of U.S. Citizenship & Immigration Services ("USCIS"), and the Consul for the U.S. Embassy in Turkey (collectively, the "Government").

Because Roe took their Green Cards, Doe and her children currently do not possess documents that might allow them to travel to a U.S. port of entry.  Compl. ¶¶ 3–4, 32.[5]  Doe points to 8 U.S.C. § 1323, the statute that makes it unlawful for a transportation company to

---

[4]  All page citations are to the page numbers that the CM/ECF system generates.

[5]  They can obtain replacements only in the United States.  Compl. ¶ 36 (citing 9 FAM § 202.2-4(D)(1)).

bring aliens to the United States who do not have valid entry documents. *Id.* ¶ 32. So she asks for an order compelling the Government to give her and her children documents that will enable lawful travel to the United States. *Id.* ¶ 46.

Doe cites "the Due Process Clause of the Constitution" as the sole basis for this relief. *Id.* at 6 ("Cause of Action").[6] She asserts that she and her children, as lawful permanent residents, have a constitutional right to due process when seeking admission into the United States. *Id.* ¶ 30.

As she sees it, the Government is denying her that right to due process. True, she admits, permanent residents can use several documents to travel to the United States. *Id.* ¶¶ 37–39, 41–42; *see* 9 FAM § 202.2-7(c) ("[Lawful permanent residents] may also travel with a valid [Alien Documentation and Identification System] stamp . . . a boarding foil . . . a Reentry Permit, a Refugee Travel Document[,] or a Returning Resident visa (SB-1)[.]"). But Doe says she is ineligible for most of these documents. Compl. ¶¶ 37–39, 41.[7] And while she could in theory receive an SB-1 visa, she claims the application process would deny her due process. *Id.* ¶¶ 42–45. She would have no right to a hearing, no right to an independent decisionmaker, no right to

---

[6] In her motion for a preliminary injunction, Doe asserted that either the Acting Secretary of Homeland Security or the Director of USCIS (or both) had a "specific duty to provide the plaintiffs with evidence of lawful permanent residence under 8 U.S.C. § 1304." Mot. for Prelim. Inj. at 15, ECF No. 6. But the Complaint contains no reference to § 1304, and in any event, Doe expressly withdrew this claim at the March 13 hearing. Tr. of Mar. 13 Hr'g at 50–51. She also alluded to a possible equal protection claim for the first time at this hearing. *Id.* at 17, 23. But she acknowledged that her Complaint did not plead this claim. *Id.*

[7] According to Doe, she and her children cannot obtain Alien Documentation and Identification System stamps or reentry permits outside the United States. Compl. ¶¶ 37–38. Refugee Travel Documents are unavailable because they are not refugees. *Id.* ¶ 39. And they are ineligible for boarding foils because she did not pay a filing fee within a year of her last departure from the United States. *Id.* ¶ 41 (citing 9 FAM § 202.2-5(B)(d)).

counsel, no right to cross-examine witnesses, no record of proceedings, and no right to appeal. *Id.* ¶ 45. According to her, this falls far short of the process she is constitutionally due.

Three weeks after filing her Complaint, Doe moved for a preliminary injunction, highlighting the urgency of her situation. Mot. for Prelim. Inj. at 2–3, ECF No. 6. She requested a hearing on the motion within 21 days, which the Court granted. Minute Order (Jan. 30, 2020). "At any moment," Doe stressed, Roe could discover her plans and prohibit them from leaving, "as is his right . . . under Iranian law." Mot. for Prelim. Inj. at 3. So she claimed an immediate need for travel documents. *Id.* at 2.

This request for preliminary relief was, in effect, a request for permanent relief. For Doe, relief is complete when the Government produces documents enabling travel to a U.S. port of entry. Compl. ¶ 46. Recognizing this, she moved to advance the trial on the merits and consolidate it with the hearing on the motion for a preliminary injunction. *See* Fed. R. Civ. P. 65(a)(2).

The Government opposed the motion for a preliminary injunction and moved to dismiss the Complaint. It argues that Doe's claim is not properly in court for various reasons, including lack of Article III standing and lack of ripeness. Mot. to Dismiss ("Defs.' Mot.") at 13–21, ECF No. 10-1. In particular, the Government stresses that Doe has not applied for—and refuses to apply for—any travel document, even the SB-1 visa, which she could in theory receive. *Id.* at 18–19.

At a hearing on the pending motions, the Court noted the extraordinary nature of Doe's request but also recognized the horrific circumstances she is facing. Tr. of Feb. 19 Hr'g at 52–54. So rather than issue a ruling, it encouraged the parties to reach a settlement if possible. *Id.* at

55–56.  The Court ordered the parties to file a Joint Status Report, with a second hearing to follow if they were unable to resolve the matter.  *Id.* at 57–58.

They did not reach a settlement.  Doe offered to apply for an SB-1 visa, but only if the Government could provide a date certain by which it would either grant or deny the application.  Joint Status Report ¶ 11, ECF No. 17.  The Government offered to expedite an SB-1 visa application, but it refused to guarantee a decision by a date certain.  *Id.* ¶¶ 3, 11.

At the second hearing, the Court granted Doe's motion to advance the trial on the merits, heard more arguments from the parties, and took the case under advisement, acknowledging its urgent nature.  Tr. of Mar. 13 Hr'g at 4, 56.  This matter is ripe for disposition.

## II.

Having granted consolidation under Rule 65(a)(2), the Court "treats the parties' briefing as cross-motions for summary judgment."  *Trump v. Comm. on Oversight & Reform of the U.S. House of Representatives*, 380 F. Supp. 3d 76, 90 (D.D.C. 2019).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

For the Court to reach the merits, Doe must first carry her burden of establishing the Court's jurisdiction.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  At the summary judgment stage, she cannot rest on "mere allegations," but must adduce evidence of "specific facts" that establish jurisdiction.  *Id.*

The issues here are Article III standing, ripeness, exhaustion of administrative remedies, and due process.  For all these issues, the parties' arguments revolve around *Rafeedie v. Immigration & Naturalization Service*, 880 F.2d 506 (D.C. Cir. 1989).  An overview of that case is in order.

Rafeedie was a Jordanian immigrant who came to the United States in 1975 and became a lawful permanent resident that year. *Id.* at 508. In 1986, he obtained a reentry permit so he could travel abroad. *Id.* He stated on his application for the permit that he wished to visit his mother in Cyprus. *Id.* But his mother lived in Ohio, and he ended up traveling to Syria. *Id.* at 508–09. He was apparently abroad for fewer than six months. *See id.* at 522.

After Rafeedie returned from Syria, the Immigration & Naturalization Service ("INS") came to believe that he had attended a conference affiliated with a terrorist group. *Id.* at 509. So it brought exclusion proceedings against him. *Id.* At first, the INS intended to give Rafeedie a "plenary" hearing. *Id.* That would have guaranteed several protections, such as an opportunity to cross-examine witnesses. *Id.* at 507–08. But the INS soon received "confidential information" supporting the charge of excludability, so it began "summary" exclusion proceedings instead. *Id.* at 509. As the name suggests, "summary" proceedings involved less process than "plenary" proceedings. There would be no hearing, no chance for Rafeedie to confront the evidence against him, and no administrative appeal. *Id.* at 508.

Before the summary proceedings could run their course, Rafeedie sued to enjoin them. *Id.* at 507, 509. He argued that the INS could not conduct these proceedings against permanent residents and that, even if it could, the proceedings violated the Due Process Clause of the Fifth Amendment. *Id.* at 509.

The INS sought dismissal of the suit, invoking the "prudential exhaustion requirement." *Id.* at 513. It urged that Rafeedie had to let the exclusion proceedings run their course before challenging them in court. *Id.* at 513–14.

In addressing this argument, the D.C. Circuit balanced the interests in exhaustion against the injuries that Rafeedie could face if it waited. *Id.* at 513. The interests in exhaustion were

minimal, since the court could decide Rafeedie's due process claim without additional factual development. *See id.* at 513–17. Meanwhile, the threat of irreparable injury to Rafeedie was substantial. *Id.* at 517–18. For example, if the summary proceedings led to an exclusion order, the INS could detain him immediately. *Id.* at 518. The potential for serious injury outweighed the minimal interests in exhaustion. *Id.* The district court had thus properly exercised jurisdiction over Rafeedie's request to enjoin the summary proceedings. *Id.*

On the merits, the Circuit first concluded that the INS had statutory authority to conduct summary exclusion proceedings against permanent residents like Rafeedie. *Id.* at 519. So the question was whether Rafeedie had a right to due process in the exclusion proceedings, and, if so, whether the summary proceedings guaranteed him due process. *Id.*

The court's analysis on the first part of this question is particularly relevant to Doe's case. Citing *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950), the court noted that "an applicant for initial entry has no constitutionally cognizable liberty interest in being permitted to enter the United States." 880 F.2d at 520. In other words, the Government can afford whatever process it wants to an initial entrant, including no process at all. *Id.* By contrast, "a permanent resident alien . . . in general . . . has a liberty interest in being permitted to reenter this country and is therefore entitled to due process before he can be denied admission." *Id.*

The INS argued that Rafeedie had forfeited this due process right "by leaving the country to engage in 'sufficiently nefarious' activities." *Id.* The D.C. Circuit disagreed. Based on the governing Supreme Court precedent, "the length of [an] alien's absence" from the United States is "the determining factor" for whether the alien has a right to due process upon reentry. *Id.* at 522. If an alien "has been absent from this country for such a period that he may be deemed to have abandoned his permanent resident status here," then the Government may treat him "as if

he were an initial entrant for due process purposes." *Id.* at 522–23. In other words, if the absence was for too long, the Government can afford whatever process it wants when the alien seeks admission. *Id.* at 522.

Since the length of absence was "the determining factor," the "nefarious" circumstances of Rafeedie's stay in Syria were irrelevant to whether he had lost his due process rights. *Id.* at 522–23. And the INS conceded that his trip—which lasted fewer than six months—was "too brief to work a forfeiture, on durational grounds alone, of any due process rights he may have." *Id.* at 523. So Rafeedie was "entitled to summary judgment on his claim that the Constitution guarantees him due process of law" for purposes of reentry. *Id.* at 524.

Doe would have this Court find similarly in her case.

### III.

### A.

The Court must assure itself of jurisdiction before it addresses the merits of Doe's due process claim. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). The Government argues, as the INS did in *Rafeedie*, that the Court lacks jurisdiction over this suit. Defs.' Mot. at 13–19. Here, however, the Government suggests a jurisdictional defect that the INS did not raise in *Rafeedie*: lack of Article III standing. Some of the Government's arguments against standing have force, which makes the question close. But the Court ultimately finds that Doe has established standing.

Article III of the Constitution limits the jurisdiction of federal courts to "actual cases or controversies." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). One component of the case-or-controversy requirement is standing. *Id.* To establish standing, Doe must show that she has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the

defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* To establish the first element of standing—injury in fact—the plaintiff must show that an injury is actual or imminent, as well as concrete and particularized. *Id.* at 1548.

Even though *Rafeedie* did not discuss standing, Doe relies on that case for standing here. Tr. of Mar. 13 Hr'g at 18–20. To be sure, given *Rafeedie*'s silence on the matter, the existence of jurisdiction there does not *require* the Court to find standing here, even if the two cases are identical. *See Steel Co.*, 523 U.S. at 91. But the Court still finds *Rafeedie* informative.

First, though, take a step back. Consider someone who endures a government-run proceeding that leads to an adverse outcome. Generally, if the adverse outcome resulted from the government's failure to afford due process, surely the subject of the proceeding would have standing to bring a due process claim.

Take *Franklin v. District of Columbia*, 163 F.3d 625 (D.C. Cir. 1998). A class of Spanish-speaking prisoners challenged how the D.C. Board of Parole conducted its hearings. *Id.* at 628. The prisoners claimed that the Board's failure to provide official interpreters at hearings violated their rights under the Due Process Clause of the Fifth Amendment. *Id.* at 631. The court reasoned that the prisoners would have standing if one of them had "suffered harm because of the Board's failure to provide an interpreter." *Id.* at 633. In other words, there was standing if someone had endured the allegedly unconstitutional process (a parole hearing with no interpreter) and incurred a harm from that process.

*Rafeedie* does not fit this fact pattern. Rafeedie sued to enjoin summary exclusion proceedings *before* the proceedings had run their course. 880 F.2d at 509. He had not endured the entire process, and the proceedings might not have even led to his exclusion. Yet nothing in the Circuit's opinion suggests it doubted that *Rafeedie* had standing. According to Doe, then,

*Rafeedie* means that a person can have standing to challenge an unconstitutional proceeding before that proceeding runs its course. Tr. of Mar. 13 Hr'g at 20–21. In these situations, the injury stems from the lack of a constitutional process, or, phrased differently, the prospect of having to endure the unconstitutional process.

Framed in this way, *Rafeedie*'s fact pattern is analogous to scenarios in which the D.C. Circuit has explicitly found standing. Consider *Cronin v. FAA*, 73 F.3d 1126 (D.C. Cir. 1996). The Federal Aviation Administration ("FAA") issued regulations establishing procedures for testing alcohol use by airline pilots. *Id.* at 1128. Petitioners were a pilot and a labor organization representing pilots subject to the regulations. *Id.* The pilots claimed the regulations violated procedural due process because they did not provide a hearing in some cases. *Id.* The FAA had not yet enforced the regulations against anyone, but the Circuit concluded the pilots had standing because they were "member[s] of the regulated class." *Id.* at 1130, 1133. The likelihood that the FAA would enforce the regulations against them was enough to confer standing. *Id.* at 1130.

Rafeedie was in essentially the same position as the pilots in *Cronin*. Aliens subject to summary exclusion proceedings are, in a sense, members of a "regulated" class. When the INS decided it would conduct summary proceedings against Rafeedie, he became a member of that regulated class. So, just as in *Cronin*, the prospect of being subject to those proceedings would have been enough to confer standing.

So Doe's reading of *Rafeedie* on this point is right: it shows that someone challenging an unconstitutional process need not endure it first to establish standing. Indeed, the Government fails to cite any case holding otherwise. *See* Defs.' Mot. at 17–18. The injury in *Rafeedie* stemmed from the INS's alleged failure to have summary proceedings that afforded due process. Phrased differently, the injury stemmed from the prospect of having to endure the INS's

unconstitutional proceedings. Either way, the injury was directly traceable to the INS. And the remedy Rafeedie sought—an injunction—would redress his injury, since it would prevent the INS from subjecting him to unconstitutional proceedings. The INS would have to afford him due process or else leave him alone. So all the elements of standing were present in *Rafeedie* even though the allegedly unconstitutional process had not run its course.

The question, then, is whether Doe's case fits *Rafeedie*'s fact pattern. If so, *Rafeedie* strongly supports a finding of standing here. The Court finds that Doe's case does indeed match *Rafeedie* in all relevant respects.

Doe's injury mirrors Rafeedie's injury. She is currently unable to travel to the United States, and she claims there is no constitutional process that would enable her to travel here. *See* Compl. ¶¶ 22–23. Put differently, her injury stems from the prospect of having to endure the SB-1 application process—a process that she believes would violate her due process rights.

True, the injury in *Rafeedie* might seem more particularized and imminent. Rafeedie learned that the INS planned to conduct summary exclusion proceedings against him. 880 F.2d at 509. So he had an immediate choice between enduring that process and challenging it in court.

Doe has not invoked the SB-1 process that she is challenging. Indeed, as the Government understandably emphasizes, she refuses to invoke this process. Defs.' Mot. at 18. But the Government has cited no case suggesting that Doe's refusal to invoke the procedures she challenges puts her in a materially different position than someone like Rafeedie. *See id.* at 17–18.[8]

---

[8] The Court did find a case suggesting that someone lacks standing to challenge procedures he has not invoked. *See Hartman v. Summers*, 120 F.3d 157 (9th Cir. 1997). A California judge found Hartman not guilty by reason of insanity and committed him to a state hospital. *Id.* at 159.

And the Court sees no meaningful difference, given Doe's circumstances. Doe and her children are not raising some generalized grievance against the SB-1 process. They wish to return to this country, having previously received permanent resident status. This status, as they see it, means the Government cannot prevent their return without affording due process. But, they insist, that is exactly what will happen if the Government denies them SB-1 visas. So if some aspect of the SB-1 process is unconstitutional, this affects Doe and her children. And they have the same immediate choice that Rafeedie had: either endure this process or challenge it in court. For these reasons, Doe's claimed injury is just as personal and imminent as Rafeedie's injury.

The Government insists that Doe cannot show injury because she and her children do not have the due process right they claim to have. *Id.* at 16–17. This argument fails because a court must assume the merits of a plaintiff's legal claim when evaluating standing. *Schnitzler v. United States*, 761 F.3d 33, 40 (D.C. Cir. 2014). So when evaluating standing here, the Court must assume that Doe and her children have the due process right they claim to have.

Indeed, in *Schnitzler*, the D.C. Circuit rejected an argument virtually identical to the one the Government offers here. The plaintiff wanted to renounce his citizenship and claimed that the renunciation procedures violated his due process rights. *Id.* at 35, 39. The Government argued that the plaintiff lacked standing because there is no constitutional right to renounce citizenship. *Id.* at 40. But the court held this was "a merits question, not a question of standing." *Id.* So too here.

---

Hartman sought release from custody, arguing that California's release procedures for insanity acquittees violated due process. *Id.* But the Ninth Circuit held that Hartman lacked standing. *Id.* at 160. In the court's view, Hartman had not shown an actual or imminent injury because he had not invoked the release procedures he was challenging. *Id.* The Court does not rely on this out-of-circuit decision, however, because *Rafeedie* strongly supports Doe's standing.

More forceful is the Government's argument that Doe cannot trace her injury to anything it has done. Defs.' Mot. at 19. The Government reiterates that Doe has not applied for any travel document. As the Government sees it, before Doe filed her Complaint, the Government was unaware of her situation, let alone causing her injury.

But Doe's injury is just as traceable to the Government as Rafeedie's injury was. Doe's injury stems from the *Government*'s failure to make available a constitutional process that would enable her to travel here. Put differently, the prospect of having to endure the SB-1 application process is traceable to the Government because it is the *Government*'s process.

Recall *Cronin*. The FAA had not yet enforced the alcohol testing regulations against any pilots. 73 F.3d at 1133. Yet the pilots still had standing to challenge them, simply because they were members of the "regulated class." *Id.* at 1130. So standing did not turn on whether the Government was "aware" of the faceless pilots or whether the Government was actively depriving them of anything.

*Schnitzler* is also instructive. The plaintiff there was a prisoner who challenged statutes and policies governing renunciation of citizenship. 761 F.3d at 35, 41. He claimed that the Government's requirements—such as an in-person interview—violated the due process rights of a prisoner like himself who could not travel. *Id.* at 39–40. Before suing, he corresponded with various federal agencies about these requirements, making it known that he wished to renounce his citizenship and asking the Government to let him do so. *Id.* at 35–36.

The Circuit characterized the plaintiff's injury as "being required to continue his association with the United States against his wishes." *Id.* at 40. The court found this injury traceable to the Government's conduct, but not because the plaintiff had corresponded with federal agencies before suing. Rather, it was simply because the plaintiff was challenging the

*Government*'s statutes and policies.  *See id.* at 41.  That is exactly what Doe is doing here, so her refusal to apprise the Government of her grievance beforehand does not vitiate causation.

More, *Schnitzler* shows how the Government can be the cause of an injury even if it is not, like in *Rafeedie*, about to take *affirmative* action against someone.  The Government was not looking to act against Schnitzler or otherwise alter the status quo.  It was Schnitzler who wanted the Government to alter the status quo by waiving the in-person interview requirement for him.  *Id.* at 35.  Yet Schnitzler still had standing.  *Id.* at 41.

So, for purposes of causation, there is no difference between someone (like Doe or Schnitzler) suing to compel the Government to restructure its proceedings and someone (like Rafeedie) suing to prohibit the Government from conducting proceedings against him.  *Cf. United States v. W. Elec. Co.*, 46 F.3d 1198, 1206 (D.C. Cir. 1995) ("The mandatory injunction has not yet been devised that could not be stated in prohibitory terms." (cleaned up)).  Either way, the Government is the source of the injury.

Finally, Doe has established redressability.   Indeed, the Government does not challenge this element of standing.  *See* Defs.' Mot. at 15–19.  Doe seeks an order compelling the Government to give her travel documents.  Compl. ¶ 46.  This would redress the Government's failure to provide a constitutional process for obtaining travel documents because it would allow her to obtain them without having to endure *any* process.  Rather than restructure the SB-1 visa process and having Doe go through that process, the Government would just give Doe travel documents.

To be sure, this is a different sort of relief than what Rafeedie sought.  He sued to enjoin the summary proceedings.  If the court had granted that injunction, the INS might have just

restructured those proceedings or conducted plenary proceedings against him instead. It would not have necessarily left him alone forever.

But this difference just means that Doe is making a request for *broader* relief. This only enhances redressability. If enjoining an unconstitutional process can redress injury stemming from that process, then surely allowing someone to bypass the process does so as well. The broader nature of Doe's desired remedy might mean it is improper. But that goes to the merits. *See infra* Section IV.A.

## B.

The Government next contends that this matter is not ripe for judicial resolution. Ripeness has both a constitutional component and a prudential component. *Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 808 (2003). The Government attacks ripeness on both fronts. *See* Defs.' Mot. at 13–16.

The Government's attack on the constitutional part of ripeness, *id.* at 15–16, fails right out of the gate. That is because "the constitutional requirements of the ripeness doctrine will necessarily be satisfied" if "a threatened injury is sufficiently 'imminent' to establish standing." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1428 (D.C. Cir. 1996). In other words, the constitutional part of ripeness "is subsumed into the Article III requirement of standing." *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012). Because Doe has established the elements of standing—including injury—this case is "constitutionally ripe." *Id.*

The Government insists, though, that the case is not prudentially ripe. *See* Defs.' Mot. at 13–14. "Even if a case is constitutionally ripe . . . there may also be prudential reasons for refusing to exercise jurisdiction." *Am. Petroleum Inst.*, 683 F.3d at 386 (cleaned up). Courts must balance "the fitness of the issues for judicial decision and the hardship to the parties of

19

withholding court consideration." *Nat'l Treasury Emps. Union*, 101 F.3d at 1427 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)).

In attacking prudential ripeness, the Government at times suggests that Doe improperly failed to exhaust her administrative remedies. *See* Defs.' Mot. at 27; Defs.' Reply at 6–7, ECF No. 14. Both doctrines—prudential ripeness and exhaustion—"contain exceptions . . . which permit early review." *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 13 (2000). So the Court must balance the interests for and against early review. *See Rafeedie*, 880 F.2d at 513–14 (discussing both "exhaustion" and "ripeness").

The Government, for its part, insists that Doe has come to court much too early. Tr. of Mar. 13 Hr'g at 28–29. Judicial resolution at this stage would prematurely interfere with agency processes, the Government suggests. Defs.' Mot. at 14. Indeed, it would *prevent* any agency processes from playing out, since Doe seeks to bypass the procedures for obtaining travel documents.

Recall that Doe has not submitted—and still refuses to submit—any application for travel documents. Tr. of Mar. 13 Hr'g at 28–29. According to the Government, if she had, an appropriate official would have been able to review the application. If granted, there would be no need to come to court at all, for Doe would have her documents. If denied, Doe could then come to court and claim that the process she went through was unconstitutional. The court would then have a proper record of what process the agency afforded. And the court could resolve Doe's due process claim based on this record.

The INS made the same arguments for why Rafeedie's suit was premature. But the D.C. Circuit rejected them. *See* 880 F.2d at 513–17. The interests in letting agency proceedings

against Rafeedie run their course were "minimal." *Id.* at 517. More, these interests paled in comparison to the hardship Rafeedie might face if the court waited. *Id.* at 518. Ditto here.

In *Rafeedie*, the INS urged against "premature judicial interference with the agency's interpretive process." *Id.* at 513. But the court found this interest "not implicated" because the case turned on Rafeedie's "constitutional due process claim." *Id.* at 514. Doe's case likewise turns on her constitutional due process claim.

The INS also insisted that a court could not properly evaluate Rafeedie's due process claim until it knew what process the INS afforded him. *Id.* As support, the INS cited a decision in which the court "declined to intervene before the relevant procedural rules had been interpreted by the body authorized to apply them, because . . . 'anything might happen in the proceedings.'" *Id.* (quoting *Hastings v. Judicial Conference of the U.S.*, 770 F.2d 1093, 1100 (D.C. Cir. 1985)).

The court rejected the INS's appeal to *Hastings*. It interpreted that case to mean "the purposes of the exhaustion and ripeness requirements are implicated where there is *genuine doubt* as to what is going to happen in the administrative process." *Id.* (emphasis added). Since the INS was "not willing . . . to commit itself to any more than the minimum statutory summary proceeding," there was no "genuine doubt" about what would happen. *Id.* at 514–15.

Similarly, here, there is no "genuine doubt" about what will happen if Doe and her children apply for SB-1 visas. Statutes, regulations, and agency policies govern the application process. *See* 8 U.S.C. § 1101(a)(27)(A); 22 C.F.R. § 42.22(a); 9 FAM § 502.7-2. The Government has not seriously suggested that it would deviate from the normal process, other than expediting the applications. *See* Tr. of Mar. 13 Hr'g at 44–45.

Relatedly, the Government suggests, as the INS did in *Rafeedie*, that allowing the agency to develop a record would facilitate judicial review. *Id.* at 2, 43. This argument failed in *Rafeedie* because there was "no factual dispute relevant to [the court's] resolution of the constitutional issue." 880 F.2d at 516. Rafeedie's due process claim involved only questions of law. *Id.* So too here. *See infra* Section IV.

On the other side of the scale were the serious and irreparable injuries Rafeedie could face if the court waited for the summary proceedings to unfold. 880 F.2d at 518. The potential for these injuries outweighed the minimal interests in waiting. *Id.*

The same is true here. Waiting for the SB-1 process to unfold could take several months—even on an expedited track—but Doe and her children are in an urgent situation. They are subject to daily physical and verbal abuse from Roe. Compl. ¶ 1. At any moment, he could discover their plan to escape and prevent them from coming to the United States. Each day that passes without judicial resolution puts Doe and her children at greater risk of harm and makes it more likely that they will be unable to travel here even if the Court grants relief.

In sum, under *Rafeedie*, this matter is fit for judicial decision. And Doe could face significant hardship if the Court defers resolution. For these reasons, this case is prudentially ripe and the Court excuses Doe's failure to exhaust her administrative remedies. *See Abbott Labs.*, 387 U.S. at 149 (ripeness); *Rafeedie*, 880 F.2d at 518 (exhaustion).

## IV.

### A.

Having rejected the Government's threshold arguments on standing, ripeness, and exhaustion, the Court now turns to the merits. And here, the calculus turns against Doe.

To begin with, the Government contends that Doe has not brought a viable claim under the Administrative Procedure Act ("APA") because, among other reasons, she has requested no agency action. Defs.' Mot. at 19–21. But while the jurisdictional statement in Doe's Complaint mentions the APA, *see* Compl. ¶ 21, the only cause of action she raises is one under the Due Process Clause of the Fifth Amendment, *see id.* at 6. More, while one of her briefs alludes to an APA claim tied to 8 U.S.C. § 1304(d), *see* Pls.' Reply at 15, ECF No. 11, she subsequently withdrew that claim, *see* Tr. of Mar. 13 Hr'g at 50–51; *supra* note 6.

Thus, the only claim properly here is a due process claim. And this claim raises a host of difficult questions. Consider remedy. Doe does *not* ask for an injunction preventing the Government from imposing unconstitutional procedures on her in the SB-1 process. If she did, and she won her case, the Government might then restructure the SB-1 process, but Doe would still have to apply for her SB-1 visa.

Presumably because of urgency, Doe instead wants a more direct remedy: an order compelling the Government to give her travel documents. Compl. ¶ 46. It is not at all clear that this would be appropriate judicial relief. Consider what the Supreme Court said in *Landon v. Plasencia*, 459 U.S. 21 (1982). "The role of the judiciary is limited to determining whether the procedures meet the essential standard of fairness under the Due Process Clause and does not extend to imposing procedures that merely displace congressional choices of policy." *Id.* at 34–35. Allowing Doe to bypass all procedures for obtaining travel documents would amount to— and perhaps even more extraordinary than—"imposing" the Court's preferred procedures.

A limited role for the Judiciary here makes sense. After all, "immigration is a sovereign prerogative, largely within the control of the Executive and the Legislature." *Id.* at 34. As the Government rightly points out, formulating immigration procedures requires a delicate balance

among several considerations, including national security interests. Defs.' Mot. at 23; *see Rafeedie*, 880 F.2d at 523. Given this careful balance, allowing Doe to get her travel documents automatically—bypassing *all* procedures—is perhaps too blunt a remedy.

It is also unclear how much significance the Court should attach to Doe's current location. As she sees it, this case boils down to an untenable disparity between a returning alien in her position—unable to fly to a port of entry through no fault of her own—and a returning alien who *can* fly to a port of entry with Green Card in hand. Tr. of Mar. 13 Hr'g at 22–23.[9]

In the latter situation, the alien would get an admissibility hearing before an Immigration Judge ("IJ"), which, Doe says, would afford several protections, such as a right to counsel. Mot. for Prelim. Inj. at 13–14. So if the IJ denies admission, at least this decision would have resulted from a fair process. But with Doe, before she can get to a port of entry and have that admissibility hearing, she must apply for an SB-1 visa. If a consular officer denies the visa, this, she says, would be the same as denying her admission. Pls.' Reply at 17–19. And this denial would have stemmed not from a fair hearing, but from "closed proceedings in a bureaucrat's office." *Id.* at 18.

This framing sounds more in equal protection than due process. But Doe has not brought an equal protection claim. Tr. of Mar. 13 Hr'g at 17, 23. In any event, is it so clear that the Government must treat someone at a port of entry the same as someone who is abroad, even if through no fault of her own? *Cf. Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("The distinction

---

[9] Doe assumes that she and her children would be able to board a plane if they had their Green Cards. *See* Tr. of Mar. 13 Hr'g at 23. But this might not be true, the Government suggests, since they were outside the country for more than a year. Joint Status Report ¶ 6. That view accords with the statutory and regulatory framework, which suggests that Green Cards are not valid travel documents for resident aliens who have been abroad for more than a year. *See* 8 U.S.C. § 1323(a)(1); 8 C.F.R. § 211.1(a)(2); 9 FAM § 202.2-7(A)(b)(1).

between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law."). True, someone at a port of entry has not legally entered the country. *See id.* But the difference between a U.S. port of entry and a distant country could still be relevant to how much process the Government must afford in each circumstance. *See Plasencia*, 459 U.S. at 34 ("The constitutional sufficiency of procedures provided in any situation, of course, varies with the circumstances.").

Another hard question is how to account for travel documents other than an SB-1 visa that are available to Green Card holders. To be sure, some of these documents are available only to resident aliens *in* the United States. Compl. ¶¶ 37–38. But at least one travel document other than an SB-1 visa is available to aliens abroad: a boarding foil. Aliens whose Green Cards are lost or stolen may be eligible to receive a boarding foil from a consular officer. 9 FAM § 202.2-5(B)(a). If they have been outside the country for more than a year, they are eligible "as long as the Form I-131A fee is paid within the one-year period, i.e., less than one year after departure from the United States." *Id.* § 202.2-5(B)(d).

Doe says she is ineligible for a boarding foil because she did not pay the "Form I-131A fee" within a year of her last departure from the United States in 2015. Compl. ¶ 41. But which way does that cut? Doe nowhere claims it would have been impossible for her to pay this fee. *See* Tr. of Feb. 19 Hr'g at 12–13, 29; Tr. of Mar. 13 Hr'g at 17–20. So if Doe unsuccessfully applies for an SB-1 visa, has the Government denied her admission without due process, even though there was another travel document Doe could have obtained if she had paid a fee within a certain period?

The Court does not have to resolve any of these difficult questions, however, because there is a more straightforward reason Doe's due process claim fails. As she admits, her claim

relies on the premise that she and her children have a right to due process before the Government can deny them admission. Tr. of Mar. 13 Hr'g at 6. But under *Rafeedie* and Supreme Court precedent, this premise is incorrect.

The due process right that Doe claims is the one the D.C. Circuit identified in *Rafeedie*. In general, "a permanent resident alien . . . has a liberty interest in being permitted to reenter this country and is therefore entitled to due process before he can be denied admission." 880 F.2d at 520 (citing *Kwong Hai Chew v. Colding*, 344 U.S. 590, 591–92 (1953)). If the alien has been outside the country for too long, however, she loses her permanent resident status for due process purposes. *Id.* at 522–23. The protracted absence makes her an "initial entrant," and an initial entrant has no right to due process before the Government can deny her admission. *Id.* at 520, 522–23.

The key question, then, is how long is too long? In *Chew*, the resident alien had been abroad for four months, and he retained his due process right. *Id.* at 520. But in another case, the Supreme Court found that an alien who had been abroad for 19 months "could be excluded without due process." *Id.* (citing *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 214 (1953)). Indeed, the Court had "no difficulty in holding" that the Government could treat this alien as an initial entrant "for constitutional purposes." *Mezei*, 345 U.S. at 214. As the Court later put it, *Mezei* "rejected the argument of an alien who had left the country for some 20 months that he was entitled to due process in assessing his right to admission on his return." *Plasencia*, 459 U.S. at 33–34.

In sum, "the length of the alien's absence is the determining factor," and the alien in *Mezei* lost his due process right after being outside the country for 19 months. *Rafeedie*, 880 F.2d at 520, 522. It is undisputed that Doe and her children have been outside the country

continuously since 2015, far more than 19 months. Mot. for Prelim. Inj. Ex. B ¶¶ 31–32, 37–38; Tr. of Feb. 19 Hr'g at 27, 34. So under *Rafeedie* and *Mezei*, Doe and her children have no right to due process before the Government can deny them admission. This conclusion requires judgment for the Government on Doe's due process claim.

Doe protests, however, that the Court should consider the circumstances of her stay abroad, not just the length of her absence. Tr. of Mar. 13 Hr'g at 13–14, 45–47. In Doe's view, it is relevant to the due process inquiry that her abusive husband forced her back to Iran and that she has always wanted to return to the United States. *Id.* at 14.

In making this argument, Doe first relies on *Rafeedie*. She reads it to mean that length of absence is just *one* factor, not the determining factor. *Id.* at 13–14. But that is simply not what *Rafeedie* says. The INS teed up this very issue. It urged that the nefarious "circumstances" of Rafeedie's stay in Syria meant that he lost his right to due process for purposes of reentry. 880 F.2d at 520, 522. The D.C. Circuit was "unpersuaded," holding that the "circumstances" of a stay abroad are irrelevant to whether an alien has lost this right of due process. *Id.* at 522. This holding was based on its reading of Supreme Court precedent.

For example, in *Plasencia*'s due process discussion, the Court discussed only the length of absence and "did not so much as mention [the alien's] purpose in going abroad." *Id.* "The only explanation for *Plasencia* is that the degree of nefariousness of the alien's trip was irrelevant to the due process inquiry; for that purpose, the only relevant question was whether the alien had been gone so long as to lose her permanent resident status." *Id.* Thus, if an alien "has been absent from this country for such a period that he may be deemed to have abandoned his permanent resident status," the Government may treat him, upon his return, as an "initial

entrant." *Id.* at 522–23. And an "initial entrant" has no right to due process before the Government can deny him admission. *Id.* at 520.

In short, the INS unsuccessfully argued that the allegedly nefarious circumstances of Rafeedie's stay abroad were relevant to the due process question. Doe can no more argue that the sympathetic circumstances of her stay abroad are relevant.

Doe also cites decisions from other circuits that discuss "abandonment" of permanent residence with reference to intent and circumstances. Pls.' Reply at 9–12; *see Matadin v. Mukasey*, 546 F.3d 85, 88–89 (2d Cir. 2008); *Hana*, 400 F.3d at 476–77; *Khodagholian v. Ashcroft*, 335 F.3d 1003, 1006–07 (9th Cir. 2003). But these cases are inapt. None addressed the question at issue in *Rafeedie* and here: whether a Green Card holder has a right to due process before the Government can deny her admission.

These cases arose when the Government brought removal proceedings against returning aliens it considered inadmissible. So the Government *was* providing a process before denying them admission: a hearing to determine whether they had "abandoned" their permanent resident status under 8 U.S.C. § 1101(a)(20). *See Yakou*, 428 F.3d at 248–50. In each case, the Board of Immigration Appeals sided with the Government, so the circuits were simply reviewing the removal order. They had no occasion to address whether the Government *needed* to provide this removal hearing under the Constitution. If the aliens in these cases were abroad for more than 19 months before returning, then under *Rafeedie*, removal proceedings would have been a matter of grace, not constitutional right. So these cases are not inconsistent with *Rafeedie*.

Doe also suggests that, whatever *Rafeedie* might say, Congress has since clarified that length of absence is not the only relevant factor. *See* Tr. of Mar. 13 Hr'g at 14, 47, 53. Seven years after the D.C. Circuit decided *Rafeedie*, Congress passed major immigration legislation—

the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRAIRA"), Pub. L. No. 104-208, 110 Stat. 3009. Doe asserts that under IIRAIRA, the "ultimate factor" is whether a Green Card holder "left the United States with the intention of returning within a reasonably short time." Tr. of Mar. 13 Hr'g at 14. This contention—that IIRAIRA supersedes *Rafeedie*—fails for three reasons.

*First*, Doe neglects to flesh out this argument. *See id.* at 14, 47, 53. *Rafeedie*'s holding is one of *constitutional* law—length of absence determines if an alien has lost her permanent resident status for due process purposes. Doe fails to explain how anything Congress says could supersede this constitutional holding. Nor does she specify what provisions in IIRAIRA make an alien's intent the "ultimate factor." It is "not enough" for Doe to make this argument "in the most skeletal way," leaving the Court to "put flesh on its bones." *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) (cleaned up). But that is what Doe does here.

*Second*, when the D.C. Circuit decided *Rafeedie*, the immigration laws already suggested that intent could be relevant to whether a Green Card holder has abandoned permanent residence under 8 U.S.C. § 1101(a)(20). IIRAIRA was not such a game-changer in this regard. For example, the law recognized that a Green Card holder would "not be regarded as making an entry into the United States" if he proved that "his departure . . . was not intended or reasonably to be expected by him[,] or his presence in a foreign port or place . . . was not voluntary." 8 U.S.C. § 1101(a)(13) (1988).

More, the law classified Green Card holders "returning from a temporary visit abroad" as "special immigrant[s]." *Id.* § 1101(a)(27)(A) (1988). This provision is still in effect, and it underlies SB-1 eligibility, which looks in part to whether an alien departed the country intending to return. *See* 22 C.F.R. § 42.22(a)(2). In short, much of the current statutory framework—

which Doe says focuses on intent—*also* existed in 1989, when *Rafeedie* was decided. Yet *Rafeedie* still held that the length of an alien's absence is "the determining factor" for the due process question. 880 F.2d at 522.

*Third*, IIRAIRA did not change the one statute that the D.C. Circuit *did* consider. *Rafeedie*'s conclusion "that the length of the alien's absence is the determining factor" was "buttressed by an examination of the relevant naturalization statute." *Id.* Under this statute, an "absence of less than six months" was "deemed not to interrupt continuous residence for naturalization purposes." *Id.*; *see* 8 U.S.C. § 1427 (1988). That provision still exists, *see* 8 U.S.C. § 1427 (2018), so the statutory framework "buttresses" *Rafeedie*'s constitutional holding just as much now as it did in 1989.

## B.

Even though Doe's Complaint raises only a due process claim, her briefs press two arguments about "burden of proof." Both arguments rely on *Woodby v. INS*, 385 U.S. 276 (1966). There, the Supreme Court held that, unless Congress directs otherwise, "no deportation order may be entered" against a resident alien "unless it is found by clear, unequivocal, and convincing evidence that the facts alleged as grounds for deportation are true." *Id.* at 284, 286.

Doe's first argument here is another attempt to save her due process claim, despite the plain import of *Mezei* and *Rafeedie*. She claims that *Woodby* supersedes these cases and that *this Court* should apply a "clear, unequivocal, and convincing evidence" standard in determining if Doe has abandoned her permanent resident status for purposes of due process. Pls.' Reply at 9–12; Tr. of Feb. 19 Hr'g at 48–52; Tr. of Mar. 13 Hr'g at 6–8. Her second argument based on *Woodby* is that the Government "openly imposes an unlawful burden of proof" on SB-1

applicants.  Mot. for Prelim. Inj. at 14.  She seems to frame this latter argument as separate from her due process claim.  *See id.*  Neither of Doe's *Woodby* arguments provides a basis for relief.

First up is Doe's contention that *Woodby* supersedes *Mezei* and *Rafeedie*.  Doe acknowledges that the alien in *Mezei* was "found not to have due process rights" because he had been "outside of the United States for a long period of time."  Tr. of Feb. 19 Hr'g at 48.  But she claims that the later decision in *Woodby* renders *Mezei* "obsolete."  *Id.* at 48–49.  This is so, she says, because *Woodby* addressed an issue that *Mezei* did not: what standard of proof applies when deciding if a Green Card holder has abandoned her permanent resident status.  *Id.*  And for this reason, Doe also submits that *Woodby* should influence how the Court reads *Rafeedie*, *see id.*, even though *Rafeedie* came *after Woodby* and did not mention that case.

Doe is mistaken on both counts.  *Woodby* does not render *Mezei* obsolete, and it is irrelevant to *Rafeedie*'s due process inquiry.  *Woodby* held that a "clear, unequivocal, and convincing evidence" standard applies for "the facts alleged as grounds for deportation."  385 U.S. at 286.  So *Woodby* was just about what standard of proof applies in deportation proceedings.  It says nothing about what standard applies when *a court* asks—like in *Mezei*—if a Green Card holder is "entitled to due process before he can be denied admission."  *Rafeedie*, 880 F.2d at 520.  It also says nothing about what factors are relevant to whether a Green Card holder retains this due process right.  *Woodby* thus does not contradict *Rafeedie*'s holding that length of absence is the only relevant factor.

To be sure, as Doe points out, more recent cases like *Matadin*, *Hana*, and *Khodagholian* have applied *Woodby*'s standard.  Tr. of Feb. 19 Hr'g at 50.  But context matters.  Those cases, like *Woodby*, were about what standard of proof applies in removal proceedings, not civil actions.  If the Government wants to remove an alien because she has "abandoned" her

permanent residence under 8 U.S.C. § 1101(a)(20), it must, under *Woodby*, prove "abandonment" by clear, unequivocal, and convincing evidence. *E.g.*, *Matadin*, 546 F.3d at 90–91; *see supra* Section IV.A. This says nothing about what evidentiary standard applies in a civil action like this.

More, Doe's case concerns "abandonment" in a different context—whether a Green Card holder has abandoned her permanent resident status for purposes of due process, not § 1101(a)(20). And *Rafeedie* held that the only relevant "evidence" for *this* abandonment question is how long the Green Card holder has been outside the country. *Matadin, Hana*, and *Khodagholian* do not contradict this holding, as already explained. *See supra* Section IV.A.

Doe next invokes *Woodby* for a different purpose: to argue that the SB-1 process imposes an unlawful burden of proof on the applicant. Mot. for Prelim. Inj. at 14. According to one embassy, the "majority" of SB-1 applicants "fail to present convincing evidence that their prolonged absence of over 365 days was caused by reasons beyond their control." U.S. Embassy & Consulates in Turkey, *Returning Resident Visa*, https://tr.usembassy.gov/visas/immigrant-visas/returning-resident-visa/ (last visited Mar. 31, 2020). Based on this statement, Doe contends that the SB-1 process has it backwards—it should be the *Government* that has to prove its case by "clear, unequivocal, and convincing evidence." Mot. for Prelim. Inj. at 14; *see Woodby*, 385 U.S. at 286.

As discussed, several circuits have held the Government to this burden of proof in removal proceedings. *See, e.g.*, *Matadin*, 546 F.3d at 90–91. As Doe sees it, denial of an SB-1 visa would have the same effect as formal removal—exclusion from this country. Pls.' Reply at 19. So, she concludes, the burden of proof that applies in removal proceedings should apply in the SB-1 process as well. Mot. for Prelim. Inj. at 14.

In her opening brief, Doe seems to frame this burden of proof issue as separate from her due process claim. *See id.* ("[T]he Department of State's rules and policies [for SB-1 visas] provide virtually no due process whatsoever[.] *What is more*, the Department of State openly imposes an unlawful burden of proof upon returning residents." (emphasis added)). But her Complaint raises only a due process claim. Compl. at 6. The words "burden of proof" are absent from that pleading. So Doe has not properly raised a freestanding burden of proof claim. *See Franks v. Salazar*, 816 F. Supp. 2d 49, 58 n.5 (D.D.C. 2011) ("[P]laintiffs cannot use their summary judgment briefing to press claims not raised in their . . . complaint.").

This conclusion is especially apt here because it is not even clear that Doe intends to raise a burden of proof claim independent of her due process claim. *See Brooks v. Grundmann*, 748 F.3d 1273, 1278–79 (D.C. Cir. 2014). In her reply brief, she shifts to the argument addressed earlier in this Section: that *Woodby*'s burden of proof should apply when the Court decides if she has a right to due process under *Rafeedie*. *See* Pls.' Reply at 9–12. So framed, the burden of proof issue is not independent of her due process claim. Because Doe ultimately conflates the two, it is not incumbent on the Court to read her Complaint as raising a distinct burden of proof claim that it never mentions. *See Brooks*, 748 F.3d at 1278–79.

In any event, Doe cannot sustain a freestanding burden of proof claim. Any claim that the SB-1 process imposes an unlawful burden of proof is just a component of her claim that the SB-1 procedures violate due process. This is because the applicable burden of proof in a proceeding is just one aspect of whether that proceeding affords due process. So if Doe has no right to due process, she has no right to any particular burden of proof.

Both *Plasencia* and *Rafeedie* show that burden of proof is just a facet of due process. In its discussion of due process, *Plasencia* noted that the alien was challenging three procedural

aspects of her exclusion hearing. 459 U.S. at 35. One aspect was that the IJ improperly "placed the burden of proof upon her." *Id.* In *Rafeedie*, the court contrasted "plenary" proceedings with "summary" proceedings, evidently to highlight why Rafeedie thought the summary proceedings violated his due process rights. *See* 880 F.2d at 507–08. One point of contrast was that in plenary proceedings, the burden was on the INS to establish excludability, while the INS did not have this burden in the summary proceedings. *See id.* at 508.

More still, in other contexts, the Supreme Court has analyzed the proper allocation of burden of proof as a question of *due process*. For example, in *Patterson v. New York*, 432 U.S. 197 (1977), the Court asked "whether New York's allocation to the defendant of proving the mitigating circumstances of severe emotional disturbance is consistent with due process." *Id.* at 202. Similarly, in *Medina v. California*, 505 U.S. 437 (1992), the Court addressed "whether California's allocation of the burden of proof in competency hearings comports with due process." *Id.* at 442–43. In both cases, the Court upheld the burden-of-proof scheme as consistent with due process. *See Patterson*, 432 U.S. at 201; *Medina*, 505 U.S. at 452.

But for our purposes, the key takeaway from these cases (as well as *Plasencia* and *Rafeedie*) is that if there had been something wrong with the burden-of-proof scheme, this would have violated *due process*. So if there is something wrong with the burden-of-proof scheme for SB-1 visas, this would violate due process. But here, Doe has no *right* to due process when seeking admission, so she has no right to due process when applying for an SB-1 visa. *See supra* Section IV.A. She thus has no right to any specific burden of proof in the SB-1 process.

Even if the Court is wrong that burden of proof is an aspect of due process, the Court still has no basis for granting Doe relief. The cases she cites on this issue were about the proper burden of proof in removal hearings. Mot. for Prelim. Inj. at 14; *see, e.g.*, *Matadin*, 546 F.3d at

90–91. She cites no authority for the proposition that the same burden also applies in a different context like the SB-1 process. *See* Mot. for Prelim. Inj. at 14; Pls.' Reply at 8 n.6, 9–12.

At most, Doe has identified a potential disparity between the burden of proof in removal hearings and the burden of proof in the SB-1 process. But this sounds in equal protection, and Doe has not properly raised an equal protection claim here. Tr. of Mar. 13 Hr'g at 17, 23.

## V.

The Court is not indifferent to the Plaintiffs' plight, nor does it question their desire to gain readmission to the United States quickly. But the wheels of justice turn slowly, and courts must apply the law without fear or favor.

The Court cannot help but note that it has been over four months since the Plaintiffs first began preparing for this suit. This is nearly how long the SB-1 application process typically lasts, and the Government has promised to expedite the process given the Plaintiffs' extenuating circumstances. The Executive, not the Judiciary, exercises the sovereign prerogative at our Nation's borders, and it has discretion to make exceptions that are unavailable to the courts.

Treating the parties' briefs as cross-motions for summary judgment under Federal Rule of Civil Procedure 65(a)(2), the Court will deny summary judgment for the Plaintiffs and will grant summary judgment for the Government. The Court will also deny as moot the Plaintiffs' motion for a preliminary injunction and the Government's motion to dismiss. A separate Order will issue.


Dated: April 1, 2020                              TREVOR N. McFADDEN, U.S.D.J.